**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**

_____

TYRONE WALKER,

                         Plaintiff,

        v.                                    No. 12-CV-807
                                                (TJM/CFH)

THOMAS LaVALLEY, Superintendent,
Clinton Correctional Facility; S. BROWN,
Deputy Superintendent of Security, Clinton
Correctional Facility; CAPTAIN FACTEAU,
Captain and Acting Deputy Superintendent
of Security, Clinton Correctional Facility;
SERGEANT DELUTIS, Special Housing Unit,
Area Supervisor, Clinton Correctional Facility,

                         Defendants.

_____

**APPEARANCES:**                            **OF COUNSEL:**

TYRONE WALKER
Plaintiff Pro Se
94-A-5258
Upstate Correctional Facility
Post Office Box 2001
Malone, New York 12953

HON. ERIC T. SCHNEIDERMAN         JOSHUA E. McMAHON, ESQ.
Attorney General for the                  Assistant Attorney General
   State of New York
Attorney for Defendants
The Capitol
Albany, New York 12224-0341

**CHRISTIAN F. HUMMEL**
**U.S. MAGISTRATE JUDGE**

### REPORT-RECOMMENDATION AND ORDER[1]

    Plaintiff <u>pro se</u> Tyrone Walker ("Walker"), an inmate currently in the custody of the New

_____

     [1] This matter was referred to the undersigned for report and recommendation
pursuant to 28 U.S.C. § 636(b) and N.D.N.Y.L.R. 72.3(c).

York State Department of Correctional and Community Supervision ("DOCCS"), brings this action pursuant to 42 U.S.C. § 1983 alleging that defendants, four DOCCS employees, violated his rights under the First, Eighth, and Fourteenth Amendments as well as rights under the Religious Land Use and Institutionalized Persons Act of 2000 ("RLUIPA"), 42 U.S.C. § 2000cc-1 et seq. Suppl. Compl. (Dkt. No. 48).[2] Presently pending is defendants' motion for summary judgment pursuant to Fed. R. Civ. P. 56. Dkt. No. 40. Walker opposes. Dkt. No. 61. For the following reasons, it is recommended that defendants' motion be granted.

## I. Background

The facts are related herein in the light most favorable to Walker as the non-moving party. See subsection II(A) infra. At all relevant times, Walker was an inmate at the Clinton Correctional Facility ("Clinton").

## A. Disciplinary History and Lawsuit

In 2000, Walker assaulted the Deputy Superintendent of Security ("DSS") of Green Haven Correctional Facility ("Green Haven"). Walker Dep. (Dkt. No. 40-6) at 12; Dkt. No. 48-1 at 10–24. Walker has a history of violent and assaultive behavior, including assault on other inmates, weapon possessions, and threatening harm to others. Dkt. No. 40-12 (inmate disciplinary history).

---

[2] By Decision and Order dated October 10, 2013, the Court granted Walker permission to file a supplemental complaint, which became the operative pleading. Dkt. No. 44.

Since 2008, Walker has been confined at Clinton's Special Housing Unit ("SHU").[3] LaValley Decl. ¶ 8.  The Clinton SHU has forty-eight cells and four housing units that are referred to as "companies."  Id. ¶ 9.

On January 6, 2011, defendant Superintendent LaValley was served with a summons and complaint for a lawsuit commenced by Walker.  Suppl. Compl. ¶ 11; LaValley Decl. ¶ 11; see Dkt. No. 48-1 at 6.  In the same month, Walker spoke with LaValley, who stated that Walker was "lucky to be alive" after attacking the Green Haven's DSS and the lawsuit filed against him was frivolous.  Suppl. Compl. ¶ 14.  Walker lodged a grievance[4] against LaValley for these statements; however, defendant Sergeant DeLutis informed Walker that he never received that grievance.  Id.; Dkt. No. 48-1 at 8.  Walker was then moved to one-company.  Suppl. Compl. ¶ 14.

## B.  Cell Movement

Walker asserts that moving him from three-company to one-company on January 31, 2011 until November 1, 2011 was retaliatory conduct because one-company is reserved for inmates with the most extensive disciplinary history.  Suppl. Compl. ¶¶ 33–34; Dkt. No. 40-8

---

[3] SHUs exist in all maximum and certain medium security facilities.  The units "consist of single-occupancy cells grouped so as to provide separation from the general population . . . ."  N.Y. COMP. CODES R. & REGS. tit 7, § 300.2(b).  Inmates are confined in a SHU as discipline, pending resolution of misconduct charges, for administrative or security reasons, or in other circumstances as required.  Id. at pt. 301.

[4] The DOCCS "IGP [Inmate Grievance Program] is a three-step process that requires an inmate to:  (1) file a grievance with the IGRC [Inmate Grievance Resolution Committee]; (2) appeal to the superintendent within four working days of receiving the IGRC's written response; and (3) appeal to the CORC [Central Office Review Committee] . . . within four working days of receipt of the superintendent's written response."  Abney v. McGinnis, 380 F.3d 663, 668 (2d Cir. 2004) (internal citations omitted).

(cell movement logs).

According to defendants, decisions on SHU cell assignments are given with input by both the SHU sergeant and DSS. Facteau Decl. (Dkt. No. 40-17) ¶ 4; LaValley Decl. (Dkt. No. 40-11) ¶¶ 13–14, 17. Defendant Captain Facteau was Clinton's Acting DSS from April 2010 until October 2011 and when Walker was moved to one-company on January 31, 2011. Facteau Decl. (Dkt. No. 40-17) ¶ 1. Facteau attested he would confer with and defer to the SHU sergeant's opinions on cell movements. Facteau Decl. ¶ 4. SHU assignments are based on the facility's operational and security needs rather than the inmates' personal preferences or mental health statuses and none of the companies exclusively housed inmates who received mental health treatment. DeLutis Decl. ¶¶ 7, 13; Facteau Decl. ¶ 5. There is neither "honor housing" in SHU nor a policy prohibiting an inmate from remaining on a particular company or cell. DeLutis Decl. ¶¶ 11, 14. Cell moves are recorded in the facility records but the reasons for the moves are not always recorded. Id. ¶ 8. Defendant Brown became the DSS in September, 2011. Brown Decl. (Dkt. No. 40-15) ¶¶ 1, 6.

DeLutis worked as Clinton's SHU sergeant for certain periods of time. DeLutis Decl. ¶¶ 1, 5. DeLutis did not work in SHU in January, 2011 and was not aware of the reason for moving Walker to one-company. Id. ¶ 6. DeLutis further explained that due to his disciplinary history, Walker could not be housed near certain inmates, which restricted the facility's ability to move Walker. Id. ¶ 9. In response to Walker's grievance on the cell movement, DeLutis advised that there is no "honor company" in SHU and Walker would be moved when security reasons allow for it. Id. ¶ 15.

Defendant Superintendent LaValley explained that he was neither involved with cell movement in SHU nor moving Walker to one-company. LaValley Decl. ¶¶ 13–14. During

4

weekly rounds, inmates would ask LaValley for cell or housing company transfers and LaValley would consult with the DSS to determine if a transfer was possible.  Id. ¶¶ 15–16.

Also according to defendants, DOCCS Classification and Movement ("CMO") decides when to transfer an inmate out of a facility based on SHU or keeplock release dates, medical and mental health, and security issues.  Brown Decl. ¶ 16; DeLutis Decl. ¶ 24; Facteau Decl. ¶ 22; LaValley Decl. ¶ 28.  Because of his violent history, Walker is considered a high-profile inmate and the Office of the Inspector General and Deputy Commissioner must review Walker's transfer requests.  LaValley Decl. ¶ 29.[5]  LaValley had no control over decisions to transfer any inmate.  Id. ¶ 30.  In November, 2011, due to the needs of Clinton, Walker was moved off one-company.  Brown Decl. ¶ 10.

### C.  Restraint Orders

DOCCS Directive # 4933 authorizes the DSS or Acting DSS to impose a restraint order on any SHU inmate who has a history of assaultive behavior.[6]  Facteau Decl. ¶ 6; LaValley

---

[5]  A central monitoring case designation form indicates that Walker requires close supervision because of the following reasons:  assassination or attempted assassination for hire; crimes committed against persons who are public officials or public figures; escape or attempted escape; high level narcotics; management problem, identified in leadership and participant roles; and crimes of violence committed against an elderly person.  Dkt. No. 48-4 at 31.

[6]  Walker alleges that in a memorandum dated June 6, 2010, Facteau had claimed there was no medical reason inhibiting Walker from being placed in restraints; however Facteau was aware that Walker had feet problems.  Suppl. Compl. ¶ 75; Dkt. No. 48-6 at 21–22 (interdepartmental memorandum and a photo of a pair of black boots).  To the extent Walker was attempting to allege a potential Eighth Amendment medical indifference claim, such a claim must fail.

The Eighth Amendment prohibition against cruel and unusual punishment extends to the provision of medical care.  Hathaway v. Coughlin, 37 F.3d 63, 66 (2d Cir. 1994).  The test for a § 1983 claim is twofold.  First, the prisoner must show that the condition to which he was exposed was sufficiently serious.  Farmer v. Brennan, 511 U.S. 825, 834

Decl. ¶ 19; Dkt. No. 40-13. Such an order must be reviewed every seven days and may be renewed on a weekly basis. Dkt. No. 40-13. LaValley, as the superintendent, did not have the authority to override the DSS's authorization of a restraint order but could override the requirement that restraints are imposed in the recreation area. LaValley Decl. ¶ 20.

### 1. February, 2011 Restraint Order

On February 28, 2011, Walker received a restraint order authorized by Facteau. Suppl. Compl. ¶ 70; Walker Dep. at 15; Facteau Decl. ¶¶ 11, 13; Dkt. No. 48-1 at 26. DeLutis was not working in SHU at this time and was not involved with imposing the original restraint order. DeLutis Decl. ¶ 17. The restraint order was imposed based on information from another inmate that Walker was planning to assault facility staff and other inmates. Suppl. Compl. ¶ 16; Facteau Decl. ¶ 9. Some of the renewals required Walker to be restrained in the recreation area while others did not. Suppl. Compl. ¶ 70.

The restraint order was renewed every seven days because it was concluded that Walker's threat of assaultive behavior had continued. Facteau Decl. ¶ 14; Dkt. No. 40-19. Once DeLutis returned to work in SHU, he also recommended renewal of the restraint order on several occasions given Walker's violent history toward staff in conjunction with the

_____

(1994). Second, the prisoner must show that the prison official demonstrated deliberate indifference by having knowledge of the risk and failing to take measures to avoid the harm. Id. "[P]rison officials who actually knew of a substantial risk to inmate health or safety may be found free from liability if they responded reasonably to the risk, even if the harm ultimately was not averted." Id. at 844. Here, Walker proffers nothing more than conclusory and unsubstantiated allegations. Walker does not allege how Facteau was aware that he had feet problems nor does he proffer any facts showing that his medical condition was sufficiently serious. Accordingly, Walker's potential Eighth Amendment medical indifference claim based on this issue must fail.

information received from an inmate. DeLutis Decl. ¶ 18.[7] The restraint orders stated the reasons for the issuance. Facteau Decl. ¶ 15; Dkt. Nos. 40-18, 40-19. The original restraint order and each renewal notified Walker that he may write to the DSS to have the order removed. Facteau Decl. ¶ 16; see, e.g., Dkt. No. 48-6 at 6–7, 9–10, 12–13, 15–16, 18–19.

On March 21, 2011, Walker filed a grievance to LaValley, complaining of the restraint order against him. Suppl. Compl. ¶ 17; Dkt. No. 48-1 at 30. On April 4, 2011, LaValley advised Walker that the matter was referred to Facteau for consideration. Suppl. Compl. ¶ 17; Dkt. No. 48-1 at 31. On May 23, 2011 and July 21, 2011, Walker filed complaints to Facteau and asserted that the restraint orders were retaliatory and issued based on false information. Suppl. Compl. ¶ 18; Dkt. No. 48-1 at 35–39.

In September, 2011, Brown became the DSS and verbally informed Walker that the restraint order would not be removed. Suppl. Compl. ¶ 21. DeLutis attested that he had consulted with Brown and recommended removing leg irons as a reward for Walker, who had recently demonstrated good behavior. DeLutis Decl. ¶ 21. Brown decided that if Walker continued to exhibit positive behavior until the new year, the restraint order would be removed. Id. Brown attested that he continued to renew Walker's restraint order every seven days based on Walker's violent history and confidential information that Walker intended to harm staff. Brown Decl. ¶ 8; see Dkt. No. 48-2 at 2–6.

By letter dated November 1, 2011, Walker complained to Brown of the restraint order, alleging that the order was imposed in retaliation for his filing of complaints and lawsuit

---

[7] Both DeLutis and Facteau denied having a retaliatory, discriminatory, or unlawful motive behind recommending and authorizing the February, 2011 restraint order and recommending its renewal. DeLutis Decl. ¶ 20; Facteau Decl. ¶ 20.

against LaValley and the past assault on a DSS.[8]  Suppl. Compl. ¶ 22; Walker Dep. at 12.

In November, 2011, Brown advised Walker that if Walker continued to demonstrate positive

behavior, Brown would evaluate the request for restraint order removal before the new year.

Brown Decl. ¶ 11; see Dkt. No. 48-2 at 7.


## 2. December, 2011 Restraint Order

On December 19, 2011, a piece of a mirror was discovered to be taped to the bottom of

Walker's foot.  Brown Decl. ¶ 12; DeLutis Decl. ¶ 22; Dkt. No. 40-9.  Brown attested that

such possession posed a threat to the safety and security of both facility staff and other

inmates.  Brown Decl. ¶ 13.  Brown imposed a new restraint order on Walker to take effect

on December 20, 2011.  Suppl. Compl. ¶¶ 23–24; Brown Decl. ¶ 13; Dkt. No. 40-16.

Walker was issued a misbehavior report, found guilty of possessing a weapon, and was

penalized with four months of SHU confinement.  Walker Dep. at 25; Suppl. Compl. ¶ 24;

Dkt. No. 40-9 (misbehavior report).  This second restraint order was renewed weekly, some

of which required Walker to be restrained in the recreation area while others did not.  Suppl.

Compl. ¶¶ 71–74.

By letter dated December 21, 2011, Walker complained to Brown that the mirror he had

was not a weapon and the restraints prevented him from engaging in meaningful

exercises.[9]  Suppl. Compl. ¶¶ 27, 66; Dkt. No. 48-2 at 26–28.  However, Walker concedes

---

[8]  Attached to that letter are copies of complaints that Walker had sent to Facteau dated May 23, 2011 and July 21, 2011 and to Delutis dated October 21, 2011.  Suppl. Compl. ¶ 22.

[9]  Walker authored additional complaints containing the same issues.  Suppl. Compl. ¶ 27; see Dkt. No. 48-2 at 32–40, 42–44.

that the mirror constituted contraband.  Walker Dep. at 22.  On January 10, 2012, Brown

lifted the restraints for the recreation area, which took affect on January 15, 2012.  Suppl.

Compl. ¶ 27; Dkt. No. 48-2 at 41, 46.

By letter dated April 2, 2012, Walker complained to Brown that the restraint orders are

discriminatory as other similarly situated inmates were not subjected to them and done in

retaliation for his filing of grievances.  Suppl. Compl. ¶ 30; Dkt. No. 48-2 at 49–51.  Walker

filed a grievance.  Suppl. Compl. ¶ 30; Dkt. No. 48-2 at 52–53.  Inmate Grievance Review

Committee ("IGRC") responded that the restraint order complied with Directive # 4933.

Suppl. Compl. ¶ 30; Dkt. No. 48-2 at 54.  Walker appealed that decision on April 11, 2012,

which LaValley affirmed on April 17, 2012.  Suppl. Compl. ¶ 30; Dkt. No. 48-2 at 55.

Between July 2, 2012 and March 7, 2013, Walker wrote at least three complaints to

Brown seeking removal of the restraint order.  Suppl. Compl. ¶¶ 77–79; 78; Dkt. No. 48-6 at

44–45.  Walker also argued that those orders were imposed with a discriminatory motive.

Suppl. Compl. ¶¶ 77–78; 78; Dkt. Nos. 48-6 at 46, 48-7 at 2–3.  Brown denied all those

complaints requesting removal of the restraint orders.  Suppl. Compl. ¶¶ 77, 79; Dkt. Nos.

48-6 at 46, 48-7 at 4–5.[10]

---

[10]  By letter, Walker requested medical attention from DeLutis for the scars and pain
caused by the restraints.  Suppl. Compl. ¶ 26; Dkt. No. 48-2 at 24.  DeLutis verbally
informed Walker that he received the letter but did not ensure that Walker received
medical attention for his ankles.  Id.  Here, Walker may be attempting to allege an Eighth
Amendment medical indifference claim.  As discussed infra, a viable Eighth Amendment
claim requires the prisoner to show he suffered from a sufficient serious medical condition
and Walker has failed to allege that element of the claim.  Farmer, 511 U.S. at 834.
Walker's scars do not constitute a sufficiently serious medical condition.  See Shakur v.
Bruno, No. 12-CV-984 (SRU), 2013 WL 556797, at *4 (D. Conn. Feb. 8, 2013) (inmate's
swollen hand not a serious medical condition) (citing Barrett v. Goldstein, 2009 WL
1873647, *2–3 (E.D.N.Y. June 29, 2009) (inmate's broken finger and damaged tendon
which were not treated for four days did not constitute serious medical condition); Jones v.

### 3. Other Inmates

Despite sharing similar prison infractions, Walker asserts that several other inmates were not placed on restraint orders because they are Caucasian while he is an African-American Muslim. See generally Suppl. Compl. ¶ 58; see also generally Dkt. Nos. 48-1 at 41–44, 48-3 at 36–43, 57–58, 48-4 at 2–24, 61-4 at 45–47 (inmate affidavits attesting to their own violent behavior). For example, Inmate Phillips had been found guilty of an assault on staff and violent conduct but was never placed on a restraint order. Suppl. Compl. ¶¶ 19–20; Dkt. No. 48-1 at 41–44. Inmate Daly stabbed a corrections officer and was never placed on a restraint order for his conduct. Suppl. Compl. ¶ 29.

Brown and Facteau explained that security measures taken for one inmate have no relevance to those for another inmate. Brown Decl. ¶ 14; Facteau Decl. ¶ 8. Rather, security measures taken are based on an inmate's history, behavior, and circumstances leading to the restraint order imposition. Brown Decl. ¶ 14; Facteau Decl. ¶ 8.

### D. Inadequate Winter Clothing

By grievance dated January 1, 2012, Walker alleged that it was "20 degrees below zero temperatures in SHU" and requested gloves, scarves, wool socks, hooded coats and sweaters, long sleeve shirts, hats, and long-johns. Suppl. Compl. ¶ 31;Dkt. No. 48-3 at 2.

---

Lindblad, No. 05-CV-814S, 2009 WL 804155, *7 (W.D.N.Y. Mar. 25, 2009 (inmate's injuries including painful area behind one ear, small cut and swollen area on top of head, cut lower lip, swollen knee and ankle and bruised shoulder did not constitute serious medical conditions sufficient to meet objective component of Eighth Amendment standard); Bonner v. New York City Police Dep't, No. 99 Civ. 3207(AGS), 2000 WL 1171150, at *4 (S.D.N.Y. Aug. 17, 2000) (claim that plaintiff suffered from swollen hand and finger that would not bend properly did not constitute serious medical condition)). Accordingly, this potential Eighth Amendment must also fail.

IGRC responded with an interdepartmental memorandum and CORC indicated that DOCCS Directives do not provide inmates with the requested clothing. Suppl. Compl. ¶ 31. Walker appealed that decision to LaValley on January 6, 2012 and non-party Bellamy, the inmate grievance director, on April 2, 2012. Id.

Between December, 2012 and March, 2013, Walker missed approximately three months of exercise due to the weather conditions and lack of winter clothing. Suppl. Compl. ¶ 90. In December, 2013, Walker attested, "[t]here is no lasting injury going to exercise, but the experience is cruel and unusual punishment." Dkt. No. 61-4 at 76.

According to Directive # 3081, Walker was issued a winter coat, four pairs of trousers, three short-sleeved shirts, one long-sleeved shirt, one sweatshirt, six pairs of undershorts, six t-shirts, six pairs of socks, one pair of work shoes, one pair of sneakers, and three handkerchiefs. LaValley Decl. ¶ 24; Dkt. No. 40-14. Walker was not provided long johns, thermal socks, gloves, or other clothing items. LaValley Decl. ¶ 24; Dkt. No. 40-14. Brown, DeLutis, Facteau, and LaValley attested that they lacked the authority to issue clothing outside the scope of the Directive # 3081. Brown Decl. ¶ 15; DeLutis Decl. ¶ 23; Facteau Decl. ¶ 21; LaValley Decl. ¶ 26. Facteau further lacked the authority to revise that Directive. Facteau Decl. ¶ 21.

### E. Excessive Noise

On July 21, 2011, Walker lodged a grievance complaining of the inmate-generated noise on one-company. Suppl. Compl. ¶ 35; Dkt. No. 48-3 at 20–21. Walker contends that the noise, to which he was not a contributor, caused him sleep deprivation and the inability to perform religious obligations. Suppl. Compl. ¶¶ 35, 46. Walker alleges that he had

11

requested a transfer for several months.  Id. ¶ 45.  IGRC responded on July 27, 2011 that there was no distinction between the cells.  Id.; Dkt. No. 48-3 at 22.

On August 18, 2011, Walker lodged a grievance with LaValley, complaining of the placement in one-company and its noise level, the placement of which was done in retaliation for his filing of a lawsuit.  Suppl. Compl. ¶ 36; Dkt. No. 48-3 at 27–28.  Walker also requested the removal of the restraint order.  Suppl. Compl. ¶ 36; Dkt. No. 48-3 at 27–28.  LaValley delegated the matter to Facteau, who never responded.  Suppl. Compl. ¶ 36; Dkt. No. 48-2 at 29.

On September 26, 2011, LaValley responded that there is no honor housing in SHU and there was no excessive noise in the SHU area.  Suppl. Compl. ¶ 45.  However, Walker asserts that during rounds on September 6, 2011, LaValley facilitated a "wall war" between Inmates Hizbullah and Reeder by stating to Reeder that he was losing.  Id. ¶ 37.  After a grievance dated October 21, 2011 was lodged, Walker was moved off one-company.  Suppl. Compl. ¶ 47; Dkt. No. 48-4 at 26–30.

Walker was upset that other inmates were moved off one-company before his turn.  See Suppl. Compl. ¶ 80.  Inmates Alexander, Garcia, and Rodriguez attested that Walker did not contribute to the noise levels in SHU.  Suppl. Compl. ¶¶ 42–44; see also Dkt. No. 48-4 at 9–18 (affidavits).

LaValley attested that while there would be yelling or banging on one-company, he did not recall one-company having excessive noise and recalled that Walker had contributed to the noise levels.  LaValley Decl. ¶ 18.  Further, DeLutis explained that noise levels do not dictate whether the company houses more or less behaved inmates.  DeLutis Decl. ¶ 11.

## F.  Cell Searches

On August 1, 2011, the first day of Ramadan, Walker's cell was searched and legal work were left mixed together on the bed.  Suppl. Compl. ¶ 48; Dkt. No. 48-5 at 2.  On August 20, 2011, a second cell search took place and Walker's food, which included dates, were removed from his cell.  Suppl. Compl. ¶ 48.  Walker required the dates to break his fast at sunset.  Id.  During this second cell search, DeLutis told Walker that there was excessive food in the cell.  Id.  On the same day, Walker complained of these events in a grievance and in a separate letter addressed to LaValley and Fischer.  Id.  Walker received responses stating that the cell searches were not done in retaliation.  Id.; Dkt. No. 48-5 at 3.  Walker conceded that none of the defendants searched his cell.  Walker Dep. at 68, 70.  Nevertheless, Walker alleges that the cell searches were retaliatory.  Suppl. Compl. ¶ 48.

Non-party Imam Assllami works at Clinton.  Assllami Decl. (Dkt. No. 40-26) ¶ 1.  During the month of Ramadan in 2011, which took place from July 31 through August 30, Muslims abstained from eating and drinking from sunrise to sunset.  Id. ¶¶ 3, 6.  Muslim inmates would spend daylight in a complete fast and can only store dates for breaking fast at sunset in the event the evening meal has not yet arrived.  Id. ¶ 4.  After sunset, inmates are served their evening meal and their breakfast Sahoor bags, which can be kept in the cell until dawn so that inmates can eat it before starting their fast.  Id. ¶ 5.

According to defendants, a DSS or superintendent may authorize a cell search if an inmate is suspected of possessing contraband.  Facteau Decl. ¶ 23; LaValley Decl. ¶ 32.  Alternatively, there may be a search if the cell number appears on the computer generated random search form.  LaValley Decl. ¶ 32; Facteau Decl. ¶ 24.  Each day, the computer system randomly selects a cell to be searched.  LaValley Decl. ¶ 32; Facteau Decl. ¶ 24.

The DSS secretary then uses a chart to pick a second cell to be searched. LaValley Decl. ¶ 32; Facteau Decl. ¶. Random cell searches are necessary for the safety and security of the facility. LaValley Decl. ¶ 32; Facteau Decl. ¶ 24.

Facteau had the authority to order cell searches when the inmate was suspected of possessing unauthorized items in the cell. Facteau Decl. ¶ 23. Walker's cell was randomly searched on August 1, 2011 and was searched based upon suspicion of excessive food storage on August 20, 2011. Facteau Decl. ¶ 26; Dkt. Nos. 40-20,[11] 40-21 at 7. Despite being advised not to do so, Walker routinely attempted to store leftovers in his cell. DeLutis Decl. ¶ 29.

Defendants disagree with Walker's characterization of the cell searches. Brown explained that he was not the Clinton DSS on August 1, 2011 and August 20, 2011 and was not involved in cell searches that took place on those dates. Brown Decl. ¶ 17. DeLutis attested that he did not search Walker's cell on either August 1, 2011 or August 20, 2011. DeLutis Decl. ¶¶ 25–26. LaValley maintains that he did not authorize any search of Walker's cell during Ramadan and never took discriminatory or retaliatory action toward. Walker. LaValley Decl. ¶¶ 34–35.

---

[11] All food leftover from meals must be given back during garbage and food tray pickup. DeLutis Decl. ¶ 28. A memorandum indicates that while Walker was at recreation, an officer removed fish, bread, other foods and discarded them but no misbehavior report was issued though the incident was noted in a frisk log book. Dkt. No. 40-20. No food was allowed to be stored in cells at any time. Id. During Ramadan, inmates can keep meals handed to them at sunset until sun rises next morning and all food must be consumed or discarded before sunrise of the following morning except dates, which may be kept in cell. Id.

14

## G.  Asbestos

By grievance dated November 23, 2011, Walker informed LaValley that he was being exposed to asbestos in SHU.  Suppl. Compl. ¶ 50; Dkt. No. 48-5 at 19–21.  Walker requested to be moved from the facility but was denied.  Suppl. Compl. ¶ 50; <u>see</u> Dkt. No. 48-5 at 23–25.  Walker testified that he may have suffered from shortness of breath but is not certain that it was caused by inhaling asbestos.  Walker Dep. at 54.  Walker contends that he had complained of this matter to all defendants.  <u>Id.</u> at 56.

Non-party Pensabene has been the senior industrial hygienist for the New York State Department of Labor since February 2008.  Pensabene Decl. (Dkt. No. 40-23) ¶ 1.  Non-party Waite has been the industrial superintendent of the Abatement/Asbestos Program since May 26, 2012.  Waite Decl. (Dkt. No. 40-25) ¶ 1.  Pensabene inspects asbestos abatement projects to ensure contractors are in compliance with regulations and has conducted hundreds of inspections.  Pensabene Decl. ¶ 4.  He documents violations, issues citations, and makes referrals to relevant agencies.  <u>Id.</u> ¶ 5.

On August 29, 2011, DOCCS began a project to remove 200-square-feet of non-friable asbestos containing materials ("ACM") from the exterior of the windows at Clinton's SHU.  Pensabene Decl. ¶ 6; Waite Decl. ¶ 4.  Friable asbestos is material that can be crumbled or pulverized and can be released into the air by hand pressure.  Waite Decl. ¶ 6.  Non-friable asbestos is less likely to become airborne and materials containing it presents a low potential for exposure.  Pensabene Decl. ¶¶ 7–8; Waite Decl. ¶¶ 8, 10.  Even if non-friable ACM is disturbed, any release of asbestos is extremely minimal.  Waite Decl. ¶ 11.  Exterior projects to remove non-friable ACM have a reduced risk of exposure.  <u>Id.</u> ¶ 12.

Pensabene visited Clinton five times on September 8, 2011, November 14, 2011, April

25, 2012, May 24, 2012, and June 13, 2012.  Pensabene Decl. ¶ 11; Dkt. No. 40-24 at

9–10.  If during an inspection, it is observed that non-friable asbestos had become friable,

the abatement contractor would be in violation and be issued a citation.  Pensabene Decl. ¶

10; Waite Decl. ¶ 13.  Pensabene did not observe asbestos becoming friable nor did he find

evidence that the Clinton project had violated any regulations during the multiple

inspections.  Pensabene Decl. ¶¶ 12–13.

For the Clinton project, workers removed all damaged window panes, scraped out the

glazing compound in the windows, replaced them with new glass panes and glazing, and

cleaned the interior of the windows.  Waite Decl. ¶ 14.  The glass panes used on the

windows are composed of wire-reinforced safety glass, which reduce the risk fo injury and

breach to the outside.  Id. ¶ 15.  According to Waite, these measures greatly reduce the

potential for building occupants to be exposed to asbestos from the glazing on the windows.

Id. ¶ 16.  An independent project monitor had visually inspected the removal and cleanup

before allowing safety barriers to be taken down.  Id. ¶ 19.  Waite attested that it is

extremely unlikely that Walker was exposed to friable asbestos at any point during the

Clinton project.  Id. ¶ 21.


## II.  Discussion

Walker contends that defendants:  (1) violated his First Amendment right to freely

exercise his religion as well as rights under RLUIPA by obstructing his ability to pray and

fast; (2) violated his First Amendment right against retaliation by subjecting him to excessive

noise and cell searches, restraint orders, inadequate recreation clothing for the winter, and

asbestos exposure; (3) violated his Eighth Amendment rights against cruel and unusual

16

when he was restrained generally and during recreational time, denied adequate winter clothing, subjected to excessive noise, and exposed him to asbestos; (4) violated his Fourteenth Amendment due process rights by placing him under a restraint order without issuing a misbehavior report, a restraint order that was based on false accusations, and orders that he remain restrained in the recreational area; (5) violated his Fourteenth Amendment equal protection by imposing the restraint order based on a false misbehavior report while similarly situated inmates were not subjected to the same security measures because they are Caucasian and Jewish while he is Black and Muslim; and (6) his right against being conspired against.  Suppl. Compl. ¶¶ 53–59, 95–96.

Defendants argue that they are entitled to Eleventh Amendment immunity, Walker's complaint should be dismissed because Walker failed to state a claim, and they were not personally involved in certain claims.  Dkt. No. 40-2.[12]

### A.  Legal Standard

A motion for summary judgment may be granted if there is no genuine issue as to any material fact if supported by affidavits or other suitable evidence and the moving party is entitled to judgment as a matter of law.  The moving party has the burden to show the

---

[12]    Section 1915(e) of Title 28 of the United States Code directs that, when a plaintiff seeks to proceed IFP, "the court shall dismiss the case at any time if the court determines that  . . . the action or appeal (i) is frivolous or malicious; (ii) fails to state a claim on which relief may be granted; or (iii) seeks monetary relief against a defendant who is immune from such relief."  28 U.S.C. § 1915(e)(2)(B).  Defendants do not address Walker's First Amendment claim based on Ramadan prayers, Eighth Amendment claim based on restraint orders, conspiracy claim, or RLUIPA claim.  However, in light of the Court's overall recommendation for the instant motion, the Court sua sponte addresses this claim pursuant to 28 U.S.C. § 1915(e)(2)(B).

absence of disputed material facts by informing the court of portions of pleadings, depositions, and affidavits which support the motion. FED. R. CIV. P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). Facts are material if they may affect the outcome of the case as determined by substantive law. Anderson v. Liberty Lobby, 477 U.S. 242, 248 (1986). All ambiguities are resolved and all reasonable inferences are drawn in favor of the non-moving party. Skubel v. Fuoroli, 113 F.3d 330, 334 (2d Cir. 1997).

The party opposing the motion must set forth facts showing that there is a genuine issue for trial. The non-moving party must do more than merely show that there is some doubt or speculation as to the true nature of the facts. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). It must be apparent that no rational finder of fact could find in favor of the non-moving party for a court to grant a motion for summary judgment. Gallo v. Prudential Residential Servs., 22 F.3d 1219, 1223–24 (2d Cir. 1994); Graham v. Lewinski, 848 F.2d 342, 344 (2d Cir. 1988).

When, as here, a party seeks judgment against a pro se litigant, a court must afford the non-movant special solicitude. See Triestman v. Fed. Bureau of Prisons, 470 F.3d 471, 477 (2d Cir. 2006). As the Second Circuit has stated,

> [t]here are many cases in which we have said that a pro se litigant is entitled to "special solicitude," . . . that a pro se litigant's submissions must be construed "liberally,". . . and that such submissions must be read to raise the strongest arguments that they "suggest," . . . . At the same time, our cases have also indicated that we cannot read into pro se submissions claims that are not "consistent" with the pro se litigant's allegations, . . . or arguments that the submissions themselves do not "suggest," . . . that we should not "excuse frivolous or vexatious filings by pro se litigants," . . . and that pro se status "does not exempt a party from compliance with relevant rules of procedural and substantive law . . . ."

18

Id. (citations and footnote omitted); see also Sealed Plaintiff v. Sealed Defendant #1, 537 F.3d 185, 191–92 (2d Cir. 2008) ("On occasions too numerous to count, we have reminded district courts that 'when [a] plaintiff proceeds pro se, . . . a court is obliged to construe his pleadings liberally.'" (citations omitted)).  However, the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion; the requirement is that there be no genuine issue of material fact.  Anderson, 477 U.S. at 247–48.

## B.  Eleventh Amendment

Defendants argue that they are entitled to Eleventh Amendment immunity against Walker's claims.  The Eleventh Amendment provides that "[t]he Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State."  U.S. CONST. amend. XI.  "[D]espite the limited terms of the Eleventh Amendment, a federal court [cannot] entertain a suit brought by a citizen against his [or her] own State."  Pennhurst State Sch. & Hosp. v. Halderman, 465 U.S. 89, 98 (1984) (citing Hans v. Louisiana, 134 U.S. 1, 21 (1890)).  Regardless of the nature of the relief sought, in the absence of the State's consent or waiver of immunity, a suit against the State or one of its agencies or departments is proscribed by the Eleventh Amendment. Halderman, 465 U.S. at 100.  Section 1983 claims do not abrogate the Eleventh Amendment immunity of the states.  See Quern v. Jordan, 440 U.S. 332, 340–41 (1979).

A suit against a state official in his or her official capacity is a suit against the entity that employs the official.  Farid v. Smith, 850 F.2d 917, 921 (2d Cir. 1988) (citing Edelman v.

19

<u>Jordan</u>, 415 U.S. 651, 663 (1974)).  "Thus, while an award of damages against an official in his personal capacity can be executed only against the official's personal assets, a plaintiff seeking to recover on a damages judgment in an official-capacity suit must look to the government entity itself," rendering the latter suit for money damages barred even though asserted against the individual officer.  <u>Kentucky v. Graham</u>, 473 U.S. 159, 166 (1985).  Here, because Walker seeks monetary damages against defendants for acts occurring within the scope of their duties, the Eleventh Amendment bar applies and serves to prohibit claims for monetary damages against them in their official capacity.

Accordingly, defendants' motion on this ground should be granted.

### C.  First Amendment

### 1.  Interference with Religion

The First Amendment protects the right to free exercise of religion.  U.S. CONST. amend. I; <u>see</u> <u>generally</u> <u>Cutter v. Wilkinson</u>, 544 U.S. 709, 719 (2005).  "Prisoners have long been understood to retain some measure of the constitutional protection afforded by the First Amendment's Free Exercise Clause."  <u>Ford v. McGinnis</u>, 352 F.3d 582, 588 (2d Cir. 2003) (<u>citing</u> <u>Pell v. Procunier</u>, 417 U.S. 817, 822 (1974)).  This right is not absolute and can be limited due to the inmate's "incarceration and from valid penological objectives—including deterrence of crime, rehabilitation of prisoners, and institutional security."  <u>O'Lone v. Estate of Shabazz</u>, 482 U.S. 342, 348 (1987) (citations omitted); <u>see</u> <u>also</u> <u>Benjamin v. Coughlin</u>, 905 F.2d 571, 574 (2d Cir. 1990) ("The governing standard is one of reasonableness, taking into account whether the particular regulation . . . is reasonably related to legitimate penological interests.") (citations omitted).

To make a claim under the First Amendment, the inmate must establish at the threshold that his sincerely held religious beliefs were substantially burdened[13] by the challenged conduct.  Salahuddin v. Goord, 467 F.3d 263, 274–75 (2d Cir. 2006) (citing Ford, 352 F.3d at 591).  "A substantial burden is more than a mere inconvenience" but "involves, for example, a situation where an adherent is forced to modify his behavior and violate his beliefs."  Gill v. Defrank, No. 98-CV-7851(NRB), 2000 WL 897152, at *1 (S.D.N.Y. July 6, 2000), aff'd, 8 F. App'x 35 (2d Cir. 2001) (citing inter alia Jolly v. Coughlin, 76 F.3d 468, 477 (2d Cir. 1996)).[14]  The defendants must then identify the legitimate penological interests justifying the challenged conduct.  Salahuddin, 467 F.3d at 274–75.  The burden shifts back to the inmate to show that such interests are irrational.  Id.  In making a reasonable determination,

> The Turner Court determined that the factors to be considered are: 1) whether there is a rational relationship between the regulation and the legitimate government interests asserted; 2) whether the inmates have alternative means to exercise the right; 3) the impact that accommodation of the right will have on the prison system; and 4) whether ready alternatives exist which accommodate the right and satisfy the governmental interest.

Benjamin, 905 F.2d at 574 (citing Turner v. Safley, 483 U.S. 78, 89–91 (1987)); see also Salahuddin, 467 F.3d at 274 (citing the same).  Defendants do not dispute that Walker's

---

[13]  In the Second Circuit, it is uncertain whether the "substantial burden" test, or a lesser "burdened" test is employed in carrying out a free exercise claim analysis.  Scott v. Shansiddeen, No. 12-CV-84, 2013 WL 3187071, at *4 n.7 (N.D.N.Y. June 20, 2013) (explaining that while the Second Circuit has applied the "substantial burden" test under free exercise claims in § 1983 cases, the Circuit has also explicitly refused to adopt the test).  In this case, because the Court finds that legitimate and reasonable penological interests justified defendants' actions, we need not decide which standard is appropriate.

[14]  All unpublished opinions cited to by the Court in this Report-Recommendation are, unless otherwise noted, attached to this Recommendation.

religious beliefs are sincerely held.

Walker contends that moving him to one-company, which is alleged to have excessive noise, has hindered his ability to carry out his prayers in a timely fashion. However, aside from Walker's conclusory statement, there is nothing in the record showing how frequently and at what times that Walker was unable to pray while confined in SHU. On the other hand, defendants have identified a legitimate penological interest for Walker's cell movement. O'Lone, 482 U.S. at 348. DeLutis explained that noise levels do not dictate whether a specific company houses more or less behaved inmates. Further, defendants attested that cell movement in SHU are made based on the operational and security needs of the facility. Due to his disciplinary history, Walker could not be housed near certain inmates, which restricted the availability of cells for Walker's movement. Moreover, the record is devoid of any allegations or evidence that an inmate's religious affiliation per se is a factor used to consider the inmate's housing assignment. As such, Walker has failed to establish a genuine issue of material fact with respect to this First Amendment claim.

Walker raised another free exercise claim based on intrusion into fasting during Ramadan. This claim cannot withstand a motion for summary judgment. Walker contends that his cell was searched twice during Ramadan in 2011 where food, including dates, was confiscated during one of the searches. First, Walker concedes that none of the named defendants had actually searched his cell and confiscated food. Walker Dep. at 69–70. Second, assuming Walker's dates were confiscated, they were only confiscated during one of those two cell searches. Such is insufficient to establish that the alleged conduct had infringed upon Walker's religious beliefs. "Absent a pattern more clearly reflecting a calculated, deliberate infringement by prison officials on the plaintiff's sincerely held

religious beliefs by depriving him or her of religious accommodations on more than one isolated, de minimis basis, a claim of constitutional significance under the First Amendment and under the RLUIPA is not stated." Walker v. Fischer, 2012 U.S. Dist. LEXIS 40846, at *38–39 (N.D.N.Y. Feb. 27, 2012) (Dkt. No. 40-4 at 62) (finding the provision of two contaminated kosher meals did not constitute a substantial burden) (collecting cases).  It cannot be said that any inconvenience stemming from the confiscation of dates on August 20, 2011 was beyond de minimis and a substantial burden that forced Walker to "modify his behavior and violate his beliefs." Gill, 2000 WL 897152, at *1.

Moreover, defendants have identified a legitimate penological interest that justifies the challenged conduct.  Facteau explained that cells are searched either at random or when an inmate is suspected of possessing unauthorized items, all of which are done in order to ensure institutional safety.  See Hudson v. Palmer, 468 U.S. 517, 522–23 (1984) (upholding constitutionality of random searches of cells without reason to suspect possession of contraband).  The records show that the first search of Walker's cell was done at random while the second was done upon the suspicion that Walker was storing food in his cell despite previous warnings.  A contraband receipt for the second search shows the search was conducted at 1:00 p.m.  Dkt. No. 40-21 at 19.  Thus, only dates were permitted in Walker's cell at that time.  As such, the two cell searches were done to serve a legitimate penological interest.  Salahuddin, 467 F.3d at 274–75.

Accordingly, Walker's free exercise claims should be dismissed from this action and defendants' motion on this ground should be granted.

## 2. Retaliation

To state an actionable claim for retaliation under the First Amendment, a prisoner must establish by a preponderance of the evidence that:  (1) the speech or conduct at issue was protected; (2) the defendant took adverse action against the plaintiff; and (3) there was a causal connection between the protected speech and the adverse action.  Gill v. Pidlypchak, 389 F.3d 379, 380 (2d Cir. 2004) (internal quotation marks and citation omitted); Tafari v. McCarthy, 714 F. Supp. 2d 317, 347 (N.D.N.Y. 2010).  In the prison context, "adverse action" is objectively defined as conduct "that would deter a similarly situated individual of ordinary firmness from exercising . . . constitutional rights."  Davis v. Goord, 320 F.3d 346, 353 (2d Cir. 2003).  "[A]dverse action taken for both proper and improper reasons may be upheld if the action would have been taken based on the proper reasons alone."  Jackson v. Onondaga Cnty., 549 F. Supp. 2d 204, 215 (N.D.N.Y. 2008).  "Types of circumstantial evidence that can show a causal connection between the protected conduct and the alleged retaliation include temporal proximity, prior good discipline, finding of not guilty at the disciplinary hearing, and statements by defendants as to their motives."  Barclay v. New York, 477 F. Supp. 2d 546, 588 (N.D.N.Y. 2007) (citations omitted).

> There is no bright line to define the outer limits beyond which a temporal relationship is too attenuated to establish a causal relationship, so courts judge the permissible inferences that can be drawn from temporal proximity in the context of particular cases.  However, courts have found that six and eight month gaps between the protected conduct and adverse action were sufficient, while in other circumstances three months was considered too long.

Burton v. Lynch, 664 F. Supp. 2d 349, 367 (S.D.N.Y. 2009) (internal quotation marks and citations omitted).

Courts must view retaliation claims with care and skepticism to avoid judicial intrusion into matters of prison administration. Jackson, 549 F. Supp. 2d at 214–15. Therefore, conclusory allegations alone are insufficient. Id. at 214 (citing Flaherty v. Coughlin, 713 F.2d 10, 13 (2d Cir. 1983) (explaining that "claim[s] supported by specific and detailed factual allegations . . . ought usually be pursued with full discovery.")). If the plaintiff establishes these elements, the burden shifts to the defendants to show by a preponderance of the evidence that they would have taken the same action against the plaintiff absent his exercising of the protected conduct. Graham v. Henderson, 89 F.3d 75, 79 (2d Cir. 1996).

Defendants concede that the filing of grievances and lawsuits are protected conduct for purposes of First Amendment claims. Dkt. No. 40-2 at 21. Defendants also correctly argue that the retaliation claims based on Walker's previous assault on Green Haven's DSS is not protected conduct. Id.; see also Wisconsin v. Mitchell, 508 U.S. 476, 484 (1993) ("[P]hysical assault is not by any stretch of the imagination expressive conduct protected by the First Amendment.") (citing inter alia NAACP v. Claiborne Hardware Co., 458 U.S. 886, 916 (1982) ("The First Amendment does not protect violence.")).

### a. Cell Movement and Excessive Noise

In this case, Walker has failed to establish a retaliation claim based on cell movement that consequently subjected him excessive noise. Walker has established an issue of fact as to whether adverse action was taken against him. Walker alleges that he was housed in one-company, a company with excessive noise and high-profile inmates. The noise was such that Walker suffered from sleep deprivation. On the other hand, defendants maintain

that one-company did not have excessive noise. A reasonable factfinder could find in Walker's favor, that the cell placement constituted adverse action because it would deter a similarly situated individual of ordinary firmness from exercising his constitutional rights. Davis, 320 F.3d at 353.

Nevertheless, Walker cannot establish a causal connection between any alleged adverse action and the protected conduct for he does not allege, and the record does not reflect the contrary, how LaValley was involved with the cell move. In fact, Brown, DeLutis, and LaValley maintain they were not involved with Walker's move to one-company. As for Facteau, he maintained that he deferred such decisions to the SHU sergeant. Facteau Decl. ¶ 4. Even if Facteau had authorized the cell move, Walker proffered nothing more than speculative allegations that such authorization was done because Walker was engaged in protected activity. Defendants explain that inmates are housed in SHU according to the facility's operational and security needs. DeLutis further attested that restrictions apply to Walker's SHU placement since Walker is a high-profile inmate who cannot be housed near certain inmates. Walker has failed to show how the temporal proximity between the filing of grievances and lawsuit against LaValley and the cell move, his disciplinary history, or defendants' statements, in any way, go toward the causal evidence that is necessary to establish a retaliation claim. Barclay, 477 F. Supp. 2d at 588. Thus, Walker has failed to establish an issue of fact with regard to this retaliation claim and the claim should be dismissed from the action. Celotex Corp., 477 U.S. at 323.

Accordingly, defendants' motion on this ground should be granted.

### b. Cell Searches and Religious Practices

Walker next claims that the cell searches were done in retaliation against him for the filing of grievances and lawsuits. Specifically, Walker claims that his legal papers were placed in disorder during the August 1, 2011 search and the seizures of property, specifically foods including dates, were improperly confiscated during the August 20, 2011 search. However, "[i]t is well-settled that retaliatory cell searches are not actionable under section 1983." Partak v. Berhle, No. 09-CV-1256 (FJS/ATB), 2011 WL 7629500, at *15 (N.D.N.Y. Sept. 12, 2011) (citing Salahuddin v. Mead, No. 95-CV-8581, 2002 WL 1968329, at *5 (S.D.N.Y. Aug. 26, 2012)). Even if retaliatory cell searches are actionable, defendants argue that those searches would have been conducted in the absence of Walker's filing of grievances and lawsuits because random cell searches are necessary to maintain institutional security and Walker was suspected of storing excessive food in his cell. Graham, 89 F.3d at 79; Dkt. No. 40-2 at 23. Walker has failed to establish even some doubt as to the true nature of the facts. Matsushita Elec. Indus. Co., 475 U.S. at 586.

Accordingly, defendants' motion on this ground should be granted.


### c. Restraint Orders

Walker maintains that the restraint orders imposed were done in retaliation against him. Defendants proffer the same argument as above, that those restraint orders would have been imposed in the absence of Walker's protected conduct. This is because the February, 2011 order was issued based on information that Walker had intentions to assault staff and other inmates. As for the December, 2011 order, that was imposed because Walker was found to be in possession of a piece of a broken mirror. Therefore, defendants would have

taken the same actions against Walker absent any protected activity done on Walker's part. Graham, 89 F.3d at 79.

Accordingly, defendants' motion on this ground should be granted.

### d. Friable Asbestos and Winter Clothing

Lastly, Walker's retaliation claims grounded on exposure to asbestos and the denial of additional winter clothing also fail to survive the motion for summary judgment. Walker does not allege facts going to how either exposure to friable asbestos or being denied additional winter clothing for exercising had deterred him from exercising his constitutional rights. Davis, 320 F.3d at 353. Further, defendants attested that they lacked the authority to transfer Walker out of Clinton. Moreover, DOCCS's clothing policy does not permit the issuance of long-johns or other additional clothing to inmates and defendants attested they could not go beyond the scope of that policy. This follows that defendants would have carried out the alleged actions even if Walker did not file grievances or lawsuits against them. Graham, 89 F.3d at 79. Walker does not proffer any facts going to the contrary. As such, Walker's retaliation claims based on exposure to asbestos and the denial of additional clothing should be dismissed from this action.

Accordingly, defendants' motion on this ground should be granted.

### D. Eighth Amendment

The Eighth Amendment prohibits the infliction of "cruel and unusual punishment." U.S. CONST. amend. VIII. Eighth Amendment obligations include the duty to protect prisoners from other known harms. Farmer v. Brennan, 511 U.S. 825, 829 (1970); Matthews v.

<u>Armitage</u>, 36 F. Supp. 2d 121, 124 (N.D.N.Y.1999) (citations omitted). The test for a §

1983 claim is twofold. First, the prisoner must show that the condition to which he was

exposed was sufficiently serious. <u>Farmer v. Brennan</u>, 511 U.S. 825, 834 (1994). Second,

the prisoner must show that the prison official demonstrated deliberate indifference by

having knowledge of the risk and failing to take measures to avoid the harm. <u>Id.</u> "[P]rison

officials who actually knew of a substantial risk to inmate health or safety may be found free

from liability if they responded reasonably to the risk, even if the harm ultimately was not

averted." <u>Id.</u> at 844.

    The Eighth Amendment imposes a duty on prison officials to take reasonable measures

to guarantee the safety of inmates in their custody. <u>Hayes v. New York City Dep't of Corr.</u>,

84 F.3d 614, 640 (2d Cir. 1996) (citing <u>Farmer</u>, 511 U.S. at 832–33). "The Constitution

does not mandate comfortable prisons but neither does it permit inhumane ones, and it is

now settled that the treatment a prisoner receives in prison and the conditions under which

he is confined are subject to scrutiny under the Eighth Amendment." <u>Farmer</u>, 511 U.S. at

832. As with other Eighth Amendment claims, a "plaintiff must satisfy both an objective . . .

and subjective test." <u>Jolly v. Coughlin</u>, 76 F.3d 468, 480 (2d Cir. 1996) (citations omitted).

Thus, "a prisoner may prevail only where he proves both an objective element—that the

prison officials' transgression was sufficiently serious—and a subjective element—that the

officials acted, or omitted to act, with a sufficiently culpable state of mind . . . ." <u>Phelps v.</u>

<u>Kapnolas</u>, 308 F.3d 180, 185 (2d Cir. 2002) (internal quotation marks and citations omitted).

                The objective prong can be satisfied by conditions of
                confinement . . . [which] in combination [constitute an Eighth
                Amendment violation] when each would not do so alone . . .
                [such as] when the conditions have a mutually enforcing effect
                that produces the deprivation of a single, identifiable human

> need such as food, warmth, or exercise—for example, a low cell
> temperature at night combined with a failure to issue blankets.

Davidson v. Murray, 371 F. Supp. 2d 361, 370 (W.D.N.Y. 2005) (citations omitted).

However, "[n]othing so amorphous as overall conditions can rise to the level of cruel and

unusual punishment when no specific deprivation of a single human need exists." Id. (citing

Wilson v. Seiter, 501 U.S. 294, 304–05 (1991)).  The subjective prong requires "a prison

official [to] have a sufficiently culpable state of mind . . ., of deliberate indifference to inmate

health or safety."  Farmer, 511 U.S. at 834 (citations omitted).


### 1.  Restraint Orders

Pursuant to DOCCS Directive # 4933, § 305.4, "[a]ny inmate assigned to an SHU who

has a history of assaultive behavior and/or who presents a threat to the safety or security of

himself/herself, other persons, or State property may be placed under a restraint order by

the Deputy Superintendent for Security, or in his/her absence, the [officer of the day] or

higher ranking authority."  Dkt. No. 40-13.  The imposition of a restraint order only violates

Eighth Amendment protections if imposed restraint is "totally without penological

justification, grossly disproportionate, or involves the unnecessary and wanton infliction of

pain."  Horne v. Coughlin, 155 F.3d 26, 31 (2d Cir. 1998) (citations omitted).  This is

because prison officials are granted wide latitude to place restraints on inmates.

In this case, the imposition of the restraint orders did not violate Walker's rights under

the Eighth Amendment.  Walker has been assigned to Clinton's SHU since 2008.  For the

first restraint order, Clinton's corrections personnel received information from an inmate that

Walker was planning an attack on staff personnel and other inmates.  Such information was

interpreted as a threat to facility security.  As for the second restraint order, Walker was discovered to be in possession of a piece of mirror.  This too, the defendants considered as a weapon.

Walker's contends that he is not a threat to security.  First, he argues that the confidential information was false.  Walker also claims that the piece of mirror he had was not a weapon.  Even assuming the truth of Walker's claims, he has not raised any issue of material fact that would permit a reasonable juror to conclude that defendants had acted totally without any penological justification, the restraints were grossly disproportionate, or the restraints involved the unnecessary infliction of pain.  Horne, 155 F.3d at 31.  While Walker believes that he did not present a threat to other inmates or staff in SHU, defendants were authorized to impose the restraint orders under DOCCS regulations.  Furthermore, defendants did so to ensure the safety of other persons after interpreting the information they uncovered as threats, which is a legitimate penological purpose.  To the extent Walker contends that he could not exercise in the recreation area due to his restraints, such a claim must fail for Walker admitted that he could still walk.  Suppl. Compl. ¶ 26.  Black v. Goord, No. 03-CV-6155 CJS, 2007 WL 3076998, at *5 (W.D.N.Y. Oct. 19, 2007) (citing Morgan v. Rowland, No. 01CV1107(CFD), 2006 WL 695813, at *8 (D. Conn. Mar. 17, 2006) ("Although he was in full restraints and could not exercise vigorously in the recreation yard, [the plaintiff] was able to walk about.  [The plaintiff] was also not restrained in his cell."); Dabney v. McGinnis, No. 97-CV-489A, 2006 WL 1285625, at *5 (W.D.N.Y. May 9, 2006) (accord)).  As such, there is no indication that the restraints were grossly disproportionate to the perceived threat.

Accordingly, this claim against defendants should be dismissed.

## 2.  Inadequate Winter Clothing

To satisfy the objective prong of the Eighth Amendment analysis, the plaintiff must demonstrate that the conditions under which he or she was confined resulted "in unquestioned and serious deprivations of basic human needs." Anderson v. Coughlin, 757 F.2d 33, 35 (2d Cir. 1985) (citing Rhodes v. Chapman, 452 U.S. at 347)).  "The [E]ighth [A]mendment is implicated, for example, when inmates are denied essential food, medical care, or sanitation, or when conditions are such that the threat of violence among inmates is increased." Morgan v. Ward, 699 F. Supp. 1025, 1054 (N.D.N.Y. 1988) (internal quotation marks and alterations omitted).

In the Second Circuit, evidence of an inmate being subjected "for a prolonged period to bitter cold" is sufficient to raise a triable issue of fact as to the objective prong. Gaston v. Coughlin, 249 F.3d 156, 164 (2d Cir. 2001) (finding in favor of prisoner who was subjected to temperatures near or well below freezing in his cell for a five-month period); see also Corselli v. Coughlin, 842 F.2d 23 (2d Cir. 1988) (precluding summary judgment where inmate was subjected to bitter cold in cell for three months).  On the other hand, where an inmate was not subjected to bitter cold for a prolonged period of time, the Second Circuit has held that summary judgment for prison officials is appropriate. Trammell v. Keane, 338 F.3d 155 (2d Cir. 2003) (finding in favor of prison officials where inmate was deprived of clothing and confined to his cell for a few weeks as a disciplinary measure).

Here, Walker has failed to establish a genuine issue of material fact with respect to this an Eighth Amendment claim.  Walker contends that he required, among other things, long-johns to be outside during his one-hour recreation time each day.  Walker Dep. at 58–59.  However, there is nothing in the record suggesting that defendants had forced Walker to be

exposed to the cold. Further, Walker testified that if he wanted to, he could have gone to recreation in the winter months without suffering harm such as hypothermia as he suggested. Walker Dep. at 59–60. Moreover, Walker conceded, and the record does not reflect the contrary, that he did not suffer from any injuries as a result of these conditions. Id.; see also Dkt. No. 61-4 at 76. Given the above, it follows that defendants did not actually know of a substantial risk to Walker's health or safety with regard to the alleged inadequate clothing. Farmer, 511 U.S. at 844.

Accordingly, defendants' motion on this ground should be granted.


### 3. Excessive Noise

For this Eighth Amendment claim, Walker fails to establish an issue of fact with respect to the objective prong. Despite claiming that the excessive noise in SHU's one-company caused him to suffer from sleep deprivation, Walker never alleges a specific medical condition resulting from the noise, for which he had sought medical attention or treatment. Farmer, 511 U.S. at 834. Thus, even if the excessive noise caused Walker discomfort, such discomfort did not amount to a constitutional violation. See Hamilton v. Fisher, No. 10-CV-1066, 2012 WL 987374, at *8 (N.D.N.Y. Feb. 29, 2012) ("An inmate normally cannot state a valid claim based on 'inmate-generated' noise as an impermissibly harsh condition of confinement.") (citation omitted); Griffin v. Coughlin, 743 F. Supp. 1006, 1018 (N.D.N.Y. 1990) ("plaintiffs presented no evidence that the noise level at Clinton PC causes physical damage"). As such, defendants did not exhibit deliberate indifference as they could not have been aware that the noise level posed a substantial risk to Walker's health or safety. Farmer, 511 U.S. at 844.

Accordingly, Walker's Eighth Amendment claim based on cell movement and excessive noise must fail on both prongs and defendants' motion on this ground should be granted.

### 4. Exposure to Friable Asbestos

Lastly, Walker alleges that defendants were deliberately indifferent to his health when they knowingly exposed him to friable asbestos in Clinton's SHU. This claim too, must fail.

"The Second Circuit has held that a prisoner who 'claims that he was exposed to friable asbestos while incarcerated . . . and [that] defendants knowingly failed to protect him from such exposure' states an Eighth Amendment claim." Johnakin v. NYC Dep't of Corr., No. 11-CV-4807 (SLT)(LB), 2013 WL 5519998, at *17 (E.D.N.Y. Sept. 30, 2013) (citing LaBounty v. Coughlin, 137 F.3d 68, 72 (2d Cir. 1998)). That claim arises from a broader "right to be free from deliberate indifference to serious medical needs' [which] . . . had been clearly established as far back as 1976 by Estelle v. Gamble, 429 U.S. 97, 104 (1976)." Id. (citing Warren v. Keane, 196 F.3d 330, 333 (2d Cir.1999) (quoting LaBounty, 137 F.3d at 74)).

To state a cognizable Eighth Amendment claim, the inmate must be exposed to an "unreasonably high concentration of air-borne asbestos parties." Johnakin, 2013 WL 5519998, at *17 (citing Simmons v. Gowanda Corr. Fact., No. 13-CV-0647Sc, 2013 WL 3340646, at *2 (S.D.N.Y. July 1, 2013) (citing inter alia Pack v. Artuz, 348 F. Supp. 2d 63, 79–80 (S.D.N.Y. 2004) ("For exposure to airborne asbestos fibers to create a substantial risk of serious harm, however, the intensity and duration of the exposure must both be significant."))). To state a claim for money damages related to asbestos exposure, a plaintiff must proffer allegations of physical injury. Id. (citing Herman v. Holiday, 238 F.3d

34

660, 665–66 (2d Cir. 2001); <u>Black v. Blackmun</u>, No. 11 Civ. 2372(BMC)(ALC), 2011 WL 6019394, at *5 (E.D.N.Y. Dec. 1, 2011) (holding that a plaintiff's claim relating to asbestos exposure failed to state a claim because the plaintiff did not allege that he "developed any diseases or conditions relating to that exposure.")).

In this case, Walker only seeks monetary damages in relation to his claim on asbestos exposure. Suppl. Compl. at 2, 63–64. Further, Walker does not allege that he suffered from any physical injury from the alleged exposure and he testified to the same. <u>Johnakin</u>, 2013 WL 5519998, at *17. Walker indicated that he experienced shortness of breath but did not provide any details of that condition and is uncertain whether it is related to the exposure. Furthermore, Walker admittedly never sought medical treatment for asbestos exposure. Moreover, Walker proffered no facts or evidence to contradict defendants' documentary evidence supporting the position that the Clinton asbestos abatement project was to remove non-friable asbestos. Defendants explained that this type of asbestos has a low likelihood of becoming airborne during the removal process. The project was conducted on the exteriors of the building, which makes exposure even less likely. Aside from Walker's conclusory and unsubstantiated allegations, there is nothing in the record to indicate that Walker was exposed to, and suffered an injury from, friable asbestos from Clinton's asbestos abatement project. Therefore, Walker's Eighth Amendment claim based on asbestos exposure cannot survive the instant motion.

Accordingly, defendants' motion on this ground should be granted.

## E. Fourteenth Amendment

### 1. Due Process

The Due Process Clause of the Fourteenth Amendment states that "[n]o State shall . . . deprive any person of life, liberty, or property without due process of law." U.S. CONST. amend. XIV § 1. It is important to emphasize that due process "does not protect against all deprivations of liberty. It protects only against deprivations of liberty accomplished without due process of the law." Baker v. McCollan, 443 U.S. 137, 145 (1979) (internal quotation and citations omitted). "A liberty interest may arise from the Constitution itself, . . . or it may arise from an expectation or interest created by state laws or policies." Wilkinson v. Austin, 545 U.S. 209, 221 (2005) (citations omitted). An inmate retains a protected liberty interest to remain free from segregated confinement if the prisoner can satisfy the standard set forth in Sandin v. Conner, 515 U.S. 472, 483–84 (1995).

Here, Walker's due process claim based on the imposition of restraint orders must fail. Walker first contends that the February, 2011 restraint order violated his due process rights because he did not receive a misbehavior report prior to being issued the restraint orders. Courts had concluded that inmates do not have a liberty interest in being free from restraints while out of his cell. See, e.g., Brown v. Coughlin, No. 93-CV-0633E(H), 1995 WL 643349, a *3 (W.D.N.Y. Oct. 13, 1995) (concluding an SHU inmate "does not have a liberty interest in being unencumbered by mechanical restraints during his exercise period"). Therefore, Walker's due process claim based on restraint orders fail as a matter of law because he proffered no liberty interest to trigger due process protections.

Moreover, even if it is assumed that Walker possessed a liberty interest against the imposition of restraints, he was already granted all process to which he was due. The

record reflects that Walker was provided a written statement of reasons for each restraint order and subsequent renewals, all of which contained instructions for Walker to object by writing. Walker proffered substantiated allegations that he objected to them. Suppl. Compl. ¶¶ 17–18, 21–22. Noting Walker's previous attack on a DSS and where the reasons for the restraint orders were related to violent threats and weapon possession, these informal procedures have afforded Walker with the due process of law. Walker v. Fischer, 523 F. App'x 43, 44 (2d Cir. 2013), cert. denied, 134 S. Ct. 1028 (2014) (citing Wilkinson v. Austin, 545 U.S. 209, 228–29 (2005) (holding where challenged decision is based on "experience of prison administrators, and where the State's interest implicates the safety of other inmates and prison personnel," "informal, nonadversary procedures" sufficiently satisfy due process requirements)).

Accordingly, defendants' motion on this ground should be granted.


## 2. Equal Protection

The Fourteenth Amendment's Equal Protection Clause mandates equal treatment under the law. Essential to that protection is the guarantee that similarly situated persons be treated equally. City of Cleburne, Tex. v. Cleburne Living Ctr., 473 U.S. 432, 439 (1985); Phillips v. Girdich, 408 F.3d 124, 129 (2d Cir. 2005) ("To prove a violation of the Equal Protection Clause . . . a plaintiff must demonstrate that he was treated differently than others similarly situated as a result of intentional or purposeful discrimination.").

> [T]he Equal Protection Clause bars the government from selective adverse treatment of individuals compared with other similarly situated individuals if such selective treatment was based on impermissible considerations such as race, religion, intent to inhibit or punish the exercise of constitutional rights, or malicious or bad

faith intent to injure a person.

Vegas v. Artus, 610 F. Supp. 2d 185, 209 (N.D.N.Y. 2009) (internal quotation marks and citations omitted).  With respect to prisoners, in order to establish an equal protection violation, the plaintiff must show that "the disparity in treatment cannot survive the appropriate level of scrutiny which . . . means that he must demonstrate that his treatment was not reasonably related to any legitimate penological interests."  Phillips, 408 F.3d at 129.

If an individual cannot "allege membership in [a protected] class, he or she can still prevail in . . . a class of one equal protection claim."  Neilson v. D'Angelis, 409 F.3d 100, 104 (2d Cir. 2005) (internal quotation marks and citations omitted).  To succeed, a plaintiff must show "that [he] were intentionally treated differently from other similarly-situated individuals without any rational basis."  Clubside, Inc. v. Valentin, 468 F.3d 144, 158–59 (2d Cir. 2006).  Additionally, a plaintiff must establish an extremely high "level of similarity between plaintiffs and the persons with whom they compare themselves . . . ."  Neilson, 409 F.3d at 104.

Here, Walker contends that SHU inmates with similar prison charges or violations are not subjected to restraint orders for as long as because he is an African-American Muslim while other inmates are Caucasian.  Walker also grounds an equal protection claim on exposure to excessive noise in one-company.  However, defendants attested that security measures taken for other inmates are not relevant to those taken for Walker because the imposition of a restraint order is based on an individual's disciplinary history and behavior leading up to the restraint order.  Defendants also explained that there is no honor housing in Clinton's SHU and inmate movement is dependent on the inmate's disciplinary history

and the facility's security needs. Walker has not proffered any evidence to show that defendants had intentionally discriminated against him with respect to the restraint orders or noise issues. Phillips, 408 F.3d at 129. Furthermore, both restraint orders were issued and renewed for the legitimate penological interest of maintaining a safe environment for both staff personnel and inmates. Id. This penological interest also applies to Walker's cell movement.

For similar reasons, to the extent Walker alleged his equal protection claim as a "class of one," such a claim must also fail. Neilson, 409 F.3d at 104. Despite Walker's conclusory allegation of defendants displaying discriminatory animus against him, Walker makes no showing that defendants had purposefully treated him differently from others similarly situated inmates without any rational basis. Giordano v. City of New York, 274 F.3d 740, 751 (2d Cir. 2001) (citations omitted) (holding a "class of one" plaintiff must also show intentional disparate treatment). As such, Walker's equal protection claim is without merit.

Accordingly, defendants' motion on this ground should be granted.

### F. Conspiracy

To establish a claim under Section 1985(3), a plaintiff must allege that (1) an agreement existed between two or more state actors to act in concert to inflict an unconstitutional injury on plaintiff, and (2) an overt act was committed in furtherance of that goal. Ciambriello v. Cnty. of Nassau, 292 F.3d 307, 324-25 (2d Cir. 2002). Conclusory, vague, and general allegations are insufficient to support a conspiracy claim. Ciambriello, 292 F.3d at 325. Therefore, the plaintiff must provide some details of the time, place, and the alleged affects of the conspiracy, which would include facts to demonstrate that there was an agreement

between the defendants to achieve some unlawful goal.  Warren v. Fischl, 33 F. Supp. 2d 171, 177 (E.D.N.Y. 1999) (citations omitted).

Here, Walker fails to provide evidence sufficient to support a viable conspiracy claim against the defendants.  There is nothing in the record to establish that defendants had any type of agreement between them.  There were no allegations outlining with specificity when, why, or how an alleged conspiracy occurred.  Warren, 33 F. Supp. 2d at 177.  Walker fails to provide any plausible information which would lend credence to a claim of an explicit or implicit agreement between any or all of the defendants.  Anilao v. Spota, 774 F. Supp. 2d 457, 512–13 (E.D.N.Y. 2011) (citations omitted).  As such, Walker has failed to allege any potential conspiracy claims in this action.

Accordingly, Walker's conspiracy claim against defendants should be dismissed.


## G.  RLUIPA

The RLUIPA provides that

> [n]o government shall impose a substantial burden on the religious exercise of a person residing in or confined to an institution . . . unless the government demonstrates that imposition of the burden on that person (1) is in furtherance of a compelling governmental interest; and (2) is the least restrictive means of furthering that compelling governmental interest.

42 U.S.C. § 2000cc-1.  In a RLUIPA claim, "[t]he prisoner must show at the threshold that the disputed conduct substantially burdens his sincerely held religious beliefs.  The defendants then bear the relatively limited burden of identifying the legitimate penological interests that justify the impinging conduct."  Salahuddin, 467 F.3d at 274–75.

> Congress, in enacting the RLUIPA, anticipated that Courts would give "due deference to the experience and expertise of prison

> and jail administrators in establishing necessary regulations and procedures to maintain good order, security and discipline, consistent with consideration of costs and limited resources. Nevertheless, prison officials cannot simply use the words "security" and "safety," and expect that their conduct will be permissible.

Singh v. Goord, 520 F. Supp. 2d 487, 499 (S.D.N.Y. 2007) (internal citations omitted).  As an initial matter, Walker is barred from obtaining monetary damages from them in their individual or official capacities under the RLUIPA claim.  Pugh v. Goord, 571 F. Supp. 2d 477, 506–09 (S.D.N.Y. 2008).

As discussed above, Walker has failed to establish that defendants' conduct infringed his religious beliefs and practices.  Moreover, because "when reviewing a claim under RLUIPA, a court must afford due deference to the experience and expertise of prison and jail administrators in establishing necessary regulations and procedures to maintain good order, security and discipline, consistent with consideration of costs and limited resources," Walker's claims should be denied for the alternative reasons discussed above.  Hamilton v. Smith, No. 06-CV-805, 2009 WL 3199520, at *7 (N.D.N.Y. Sept. 30, 2009) (internal quotation marks and citations omitted).

Accordingly, Walker's RLUIPA claim against defendants is unavailing and should be dismissed.

### H.  Qualified Immunity

Defendants contend that even if Walker's § 1983 Fourteenth Amendment and conspiracy claims are substantiated, they are nevertheless entitled to qualified immunity. Qualified immunity generally protects governmental officials from civil liability "insofar as

their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982); Aiken v. Nixon, 236 F. Supp. 2d 211, 229–30 (N.D.N.Y. 2002) (McAvoy, J.), aff'd, 80 F. App'x 146 (2d Cir. 2003). However, even if the constitutional privileges "are so clearly defined that a reasonable public official would know that his actions might violate those rights, qualified . . . immunity might still be available . . . if it was objectively reasonable for the public official to believe that his acts did not violate those rights." Kaminsky v. Rosenblum, 929 F.2d 922, 925 (2d Cir. 1991); Magnotti v. Kuntz, 918 F.2d 364, 367 (2d Cir. 1990) (internal citations omitted)). A court must first determine whether, if plaintiff's allegations are accepted as true, there would be a constitutional violation. Saucier v. Katz, 533 U.S. 194, 201 (2001). Only if there is a constitutional violation does a court proceed to determine whether the constitutional rights were clearly established at the time of the alleged violation. Aiken, 236 F. Supp. 2d at 230.

Here, the second prong of the inquiry need not be addressed with respect to Walker's § 1983 claims against the defendants because, as discussed supra, it has not been shown that defendants violated Walker's constitutional rights or conspired against Walker to violate his constitutional rights.

Accordingly, defendants' motion on this ground should be granted.

### III. Conclusion[15]

For the reasons stated above, it is hereby **RECOMMENDED** that defendants' motion for

---

[15] In light of the recommendation, the Court finds it unnecessary to address other arguments raised in defendants' motion.

summary judgment (Dkt. No. 40) be **GRANTED** as to all claims against all defendants.

Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report.  Such objections shall be filed with the Clerk of the Court "within fourteen (14) days after being served with a copy of the . . . recommendation."  N.Y.N.D.L.R. 72.1(c) (citing 28 U.S.C. § 636(b)(1)(B)-(C)).  **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW.**  Roldan v. Racette, 984 F.2d 85, 89 (2d Cir. 1993); Small v. Sec'y of HHS, 892 F.2d 15 (2d Cir. 1989); 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72, 6(a), 6(e).

Dated:  July 8, 2014
       Albany, New York

Christian F. Hummel
U.S. Magistrate Judge